1
2
3
4
5

J. Greg Coulter (State Bar No. 016890)
J. Alexander Dattilo (State Bar No. 030112)
**JACKSON LEWIS P.C.**
2111 East Highland Avenue, Suite B-250
Phoenix, AZ  85016
Telephone: (602) 714-7044
Facsimile: (602) 714-7045
Greg.Coulter@jacksonlewis.com
Alexander.Dattilo@jacksonlewis.com
*Attorneys for Defendant*

6

7

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

8

9

10

11

12

13

14

| | |
|---|---|
| Donald Bessler, a married man,<br><br>       Plaintiff,<br><br>  v.<br><br>City of Tempe, an Arizona municipal corporation,<br><br>       Defendant. | Case No:  2:19-cv-04610-MTL<br><br>**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: AFFIRMATIVE DEFENSE OF MITIGATION OF DAMAGES**<br><br>**(Assigned to the Honorable Michael T. Liburdi)**<br><br>**Oral Argument Requested** |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant City of Tempe ("Defendant" or "Tempe") responds to plaintiff Donald Bessler's ("Bessler's") Motion for Partial Summary Judgment (the "MSJ"), which requests summary judgment on the issue of whether he failed to mitigate his alleged damages. Bessler's failure to mitigate damages is straightforward: he admittedly failed to sustain a diligent pursuit of "substantially equivalent" employment. Instead, he prematurely terminated his job search and settled for temporary work within a month of his separation from Tempe.

From 2010 until his separation on November 2, 2018, Tempe employed Bessler as its Director of Public Works ("DPW"), a full-time, salaried, non-temporary, high-status position that he alleges was netting him over $220,000 in annual compensation (combining wages and benefits) just before his separation. On November 27, 2018, the City of Glendale ("Glendale") offered Bessler *temporary* contract work in a part-time, hourly, non-supervisory position that he regarded as a "consulting" role. He accepted the work,

1   which paid far less than his prior role: his 2018-2019 W-2 forms reflect a wage decrease

2   of about $56,000: from over $180,000 (from Tempe in 2018) to roughly $124,000 (from

3   Glendale in 2019). This temporary contract work for Glendale was not "substantially

4   equivalent" to his prior employment, so accepting the work never discharged his duty to

5   mitigate damages. Despite this, Bessler admits that he ended his job search almost

6   immediately after he received the offer. This alone is sufficient to carry Tempe's failure-

7   to-mitigate defense. And while not necessary, Tempe proved the availability of jobs

8   comparable to the DPW position when it produced the report (the "Report") of its expert,

9   Bradford Taft ("Taft"), with postings for comparable positions Bessler was qualified for.

10          Bessler goes to extreme lengths to gloss over relevant facts. The MSJ fails to allege

11   facts crucial to the comparisons between his current and former positions, which is at the

12   heart of the "substantially equivalent" analysis. For example, it fails to affirmatively allege

13   what compensation and benefits Bessler received in any year, and is silent on his job

14   responsibilities. An informed comparison of the compensation, status, responsibilities, and

15   other relevant factors of Bessler's current and former jobs show that he never obtained

16   "substantially equivalent" employment. The MSJ is also an about-face on Bessler's factual

17   positions. For example, he bemoaned being a "*a temporary employee earning $75 per*

18   *hour*" – but now claims that he is a salaried employee.

19          Summary judgement in favor of Bessler is not warranted under the facts or the law.

20   This response is supported by the below Memorandum of Points and Authorities. [1]

21   **MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      FACTUAL BACKGROUND**

22   **A.      All prior job changes by Bessler required his relocation a to new state.**

23          In 1980, Bessler began working in Wyoming for the City of Rawlins, as its

24   Recreation Superintendent. [**Ex. A** at 138:18–139:13; *see* **Ex. B**] In 1988, Bessler moved

25   cross-country to Vermont to work for the City of Burlington as its "Director of Parks &

26   Recreation/Harbormaster." [*Id.*] In 1993, he moved cross-country to Colorado to work as

27   ─────────────

28   [1] Tempe intends to file a dispositive motion on various issues, including Bessler's failure to mitigate damages. Tempe prospectively incorporates that forthcoming motion and all other filings.

1  the Director of Parks, Open Space & Public Facilities of the City of Longmont, and was

2  later promoted to DPW. [*Id*.] In 2010, he accepted an offer to work as Tempe's DPW. [*Id*.]

3      **B.      As DPW, Bessler had wide-ranging authority over numerous divisions.**

4      Upon being hired as DPW, Bessler began reporting directly to the City Manager.

5  [**Ex. A** at 32:25–33:3] He wielded considerable authority in this position:

6      Mr. Coulter: During the time – when you started, tell me what the general duties were of the position?

7      Plaintiff:…It was about eight departments, so I had taken over what had been a department, the Water Utility Department, the Public Works Department, and half of the Parks & Recreation Department. All were now created as the Public Works Department, so I was the new director of those departments. We were responsible for the water utility, the wastewater utility, the storm water, parks, golf courses, cemeteries, the city fleet, the city facilities division, the transportation division, the transit operations for light rail and bussing, engineering, construction management. I feel like I'm forgetting one, but that is the gist of it.

8

9

10

11  [*Id*. at 22:6–23:1] In this administrative role, Bessler oversaw four divisions:

12      Plaintiff: I still had the same divisions, the same service areas, as I described earlier, and they had a number of different things that we were doing.

13      Mr. Coulter: …can you provide me the name of the divisions?

14      A. Yes. So Public Works had four divisions: one division was our water utility. Another division was called Field Operations. The other division was Transportation. And the fourth division was Engineering. And then they had these services underneath them.

15

16      Q. Well, tell me – can you tell me the services underneath them?

17      A. Sure. So I'll start with Transportation: Transportation had the Transit Division – I'm sorry –  the Transit Service. They had the Traffic Engineering Service. And they had the Street Service. I'm speaking more functionally. That may have not been the exact title that we used for them.

18

19      Q. Completely understand.

20      A. Okay. And Engineering, we had some services that were the Construction Management Service, the Engineering and Design Service, the Right of Way and Dry Utility Service, and the Procurement Service. So typically, when I say "the services," they each had a manager-level person that managed them. In our Operations Division, we had Environmental Services. We had Water Resources. We had Tempe Town Lake and Field Sites. We had the Distribution and Collection, and we had Treatment. And the Field Operations, we had Parks, which included the cemeteries and golf course and Diablo Stadium, and we had Fleet Operations, which managed the City's city-wide vehicle program, and we had had – so I'm not remembering when you asked me this – but we had Facilities as well.

21

22

23

24

25  [*Id*. at 31:5–32:17] As DPW, Bessler was responsible for ensuring the performance of a

26  wide breadth of government functions; he oversaw multiple commissions, including the

27  Sustainability and Energy Management commissions. [*Id*. at 23:20–25:5] He was

28  responsible for "a number of major projects," including a "$200 million project" called

1    "Tempe Streetcar." [*Id*. at 30:9–31:15] The list of programs and divisions under his control

2    changed over time, but his position and responsibilities did not. [*Id*. at 23:2-25, 30:9–31:7]

3    Although Tempe employed Bessler for only 305 days of 2018, his 2018 W-2

4    reflects that he received $180,552.48 in wages from Tempe that year. [**Ex. C** at DB-0502]

5    Just before his separation in November 2018, Bessler was receiving an annual salary from

6    Tempe of over $181,000, *plus* benefits. [**Ex. D** at DB00451; **Ex. E**] In his Initial MIDP

7    Responses, Bessler stated that at the time of his separation, his annual compensation was

8    $220,904 per year, to which he attributed (1) $184,812 in salary and (2) $36,091 in

9    benefits. [*See* **Ex**. **F** at pp. 10-11 (with DB-0495-496)] He subsequently took the position

10   that his annual salary with Tempe was then $187,138. [**Ex. G** at Wenk-0020]

        **C.**      **Bessler inexplicably ended a multi-state job search once he accepted**
11               ***temporary* contract work for substantially less compensation.**

12   In the summer of 2018, around the time he indicated he wanted to separate from

13   Tempe, he began looking for work elsewhere. [**Ex. A** at 142:25–143:22] Bessler contends

14   that after being informed of his official separation date, he "immediately" began another

15   job search in October 2018, when Tempe notified him that his last day would be on

16   November 2, 2018. [*Id*. at 145:4-12] Bessler did not limit his job search to Arizona. On

17   October 13, 2018, he sent an email to the Village Administrator of New Glarus,

18   Wisconsin, wherein he inquired about a job posting he found for the DPW of that town,

19   attached a copy of his resume, and wrote: "*your village is a desirable opportunity for me.*

20   *I'm attaching my resume for your convenience…*" [**Ex. H** at ROG No. 12 (pp. 10-14); **Ex.**

21   **I** at p. 12 (with DB-634-636); **MSJ Ex. 1**] Bessler applied to or had "*meetings with*" five

22   prospective employers in Arizona, including a private entity. [**Ex. A** at 143:5–146:7]

23   Bessler alleges that he submitted 11 applications and participated in five interviews during

24   his subsequent job search that spanned from October 9 through November 27, 2018 – and

25   fails to allege that he pursued any jobs after that date. [Dkt. 84 at p. 2] One of his interviews

26   was for the City Manager position with the City of Cottonwood, Arizona, about which

27   Bessler stated: "*I had the most experience and strongest resume*." [**Ex. A** at 120:11–121:5]

28

1
2
3
4
5

On November 27, 2018, Glendale tendered to Bessler a Temporary Employment Contract (the "Temporary Contract"), which he executed. [Dkt. 84 at p. 2; **Ex. K** at COG000004-5] Bessler began working for Glendale on January 14, 2019, as a temporary employee. [**Ex. A** at 149:6-23] Since then, Bessler has neither updated his resume, nor applied or searched for full-time employment. [*Id.* at 138:18–139:18; 151:12–152:1]

6

### D.    Bessler's temporary work for Glendale forced him into multiple roles.

7
8
9
10
11

In his temporary employment with Glendale, Bessler has effectively worked in two different positions, each of which has duties and responsibilities very different from those of his old DPW position. Upon being hired as "Chief Officer of Capital Programs," he worked "*more as a contract/consultant*" and "*wasn't even supervising people.*" [**Ex. A** at 147:18-22] Bessler further described his roles as follows:

12

> Plaintiff: I was helping the City restructure, reevaluate and retool the Engineering Department to better deliver their Capital Improvement Program.

13

> Mr. Coulter: That lasted the whole nine months of that initial employment contract?

> A. Yes, but my role changed, even though I held the same contract and same title.

14

> Q. What –  how did your role change?

15

> A. I then became the – essentially the Acting Director of Engineering. I was given the day-to-day responsibility of managing the Engineering Department.

16
17
18
19
20
21
22
23
24

[*Id.* at 148:13-24] In addition to having him work in two different roles, Glendale hired Bessler as a part-time employee. [**Ex. K** at COG00003-6; **Ex. H** at ROG No. 11 (p. 10)] The initial Temporary Contract refers to Bessler as a "Temporary Professional," and he "*continues to be a contract employee...*"[2] [*Id.*] Glendale also hired Bessler as an hourly employee, and paid him at the rate of $75 per hour in 2019. [**Ex. K** at COG00003-4; **Ex. E**] Glendale employed Bessler starting January 14, 2019 and through the remainder of 2019 (*i.e.*, 351 days), but his 2019 W-2 reflects that he received only $124,628.21 in wages from Glendale that year. [**Ex. K** at COG000018; **Ex. N**] Bessler's expert acknowledged this loss of benefits, and Bessler testified that he initially received "limited" benefits:

25
26

> Mr. Coulter: Do you have – when you started with them, do you have benefits with them? Do you get – are you in the Arizona Retirement System?

27
28

---

[2] Section 4.2(C) of the Temporary Contracts designate Bessler "*Temporary Personnel*" who "*shall not be eligible to participate in Glendale's Education Assistance Program*" or (unless otherwise specified) "*any other benefit or program unless participation is required by law.*" [**Ex. K**; **Ex. M**]

1

2

Plaintiff: Yes. That was one of the attractions for me to take that position, that I was given health – I was offered health insurance benefits and the ASRS.

Q. From the start of the employment contract in 2019?

3

4

5

A. I was offered limited health insurance benefits initially for the first contract and ASRS. When I got the one-year renewal 11 months later, my benefits improved slightly. They included dental and vision and some other. And then I also started being able to accrue sick leave and vacation, which I was unable to accrue. So when I took days off, I lost pay that first year.

[**Ex. A** at 150:12–151:2; **Ex. O** at Wenk-1274]

6

7

### E.    Bessler alleged substantial losses in compensation, yet simultaneously refused to respond to written discovery on this.

8

On October 25, 2019, Bessler provided an Initial MIDP Statement. It stated in part:

9

1.  Economic Loss: At the time of his termination, Plaintiff's total compensation from City of Tempe was $220,904/year. (#DB-0495 and DB-0496). The breakdown is as follows:

10

11

12

13

- Salary – $184,812
- Employer paid benefits – $36,092 – consisting of insurance for accidental death, basic life and commuter, as well as employee assistance program; partial payment of insurance for health, dental and vision; 401k and Arizona State Retirement contributions; Flex Spending account; Wellness account; Healthcare reimbursement account; and Arizona State Retirement Long Term Disability coverage. Plaintiff has lost health care dividends of $17,000.

14

15

- PTO – Per year Plaintiff earned 136 hours of vacation; 96 hours of sick leave; 1 personal day and 11 paid holidays. Plaintiff lost over $50,000 in accrued sick leave.

16

17

18

- …All benefit calculations will be provided upon retention of an expert witness.
  ...
  **At Glendale, in the temporary position, Plaintiff earns $75/hr**. Plaintiff's other benefits include: health insurance, Employee Assistance Program, Arizona State Retirement contributions (reduced based on a lower income and lower contribution) and Arizona State Retirement Long Term Disability. As a contract employee, Plaintiff does not accumulate PTO.

19

[*See* **Ex**. **F** at pp. 10-11 (emphasis added)]. Shortly thereafter, Tempe propounded upon

20

Bessler its First Set of ROGs, wherein ROG No. 12 asked him to identify all instances in

21

which he had pursued potential job opportunities – and Bessler's answer did not list any

22

instance of this occurring after November 30, 2018. [**Ex. H** at ROG No. 12 (p. 13)][3]

23

### F.    Taft's Report clarified Bessler's employability and earning capacity.

24

In his Second Amended Complaint (the "Complaint"), Bessler asserted that he has

25

"*suffered lost wages, the value of benefits and lost retirement benefits, to proven at*

26

27

28

---

[3] The ROG instructions required Bessler to supplement his answers with any responsive information later discovered. Bessler never supplemented his answer to ROG No. 12, but supplemented his responses to other ROGs. He also refused to identify either job duties for each position he held (ROG 13), or income received in recent years (ROG 14).

1    *trial*…" and requested, among other things, "*compensatory damages*." [Dkt. 14. at p. 25]

2    Tempe's Answer asserted that he "failed to mitigate his damages, if any." [Dkt. 16 at p. 6]

3    On July 24, 2020, Tempe produced its expert disclosure that included Taft's Report

4    *and* all 6,271 pages of data (which included postings containing 4,341 job descriptions)

5    on which he based the report. [*See* **Ex. L** at TAFT000001-21] Taft's Report states in part:

6    Based on his education, training, skills, knowledge, and experience, Mr. Bessler is
     qualified to continue his career in municipal government administration…he can

7    return to administrative roles where he heads up municipal agencies…He is also
     qualified to pursue City Manager positions…

8    However, there is no documentation which shows that after accepting that offer, Mr.
     Bessler continued a job search campaign for positions providing compensation at

9    the same or higher level that he was previously earning as Director of Public Works
     for the City of Tempe.

10   …[T]here was a strong job market for positions in municipal government
     administration during the period November 1, 2018 to April 10, 2020 not only in

11   Arizona but in other parts of the United States.
     …

12   …I opine that Mr. Bessler had the opportunity to match or exceed the compensation
     level he had upon separating from the City of Tempe by conducting an effective job

13   search campaign for either a Director of Public Works or a City Manager.

14   [**Ex. L** at TAFT000004-5, 8] <u>Bessler's counsel deposed Taft, but asked him no questions</u>

15   <u>about job postings on which he bases his opinions</u>. Taft's Declaration attached hereto

16   references examples of some postings for jobs comparable to Bessler's prior position, for

17   which he is qualified. [*See* **Ex. J** at ¶¶ 6-7] Bessler provided no evidence to counter.

18   **II.   OBJECTIONS TO BESSLER'S FACTUAL ASSERTIONS**

19   The MSJ contains factual allegations that are (1) unsupported by the record and/or

20   admissible evidence, and/or (2) independently inadmissible. Bessler attempts to support

21   several factual allegations with merely his own self-serving testimony contained in his

22   declaration (MSJ Ex. 1) and/or his deposition (MSJ Ex. 7). Tempe objects generally to

23   every factual allegation in the MSJ supported only by these forms of uncorroborated

24   evidence, as well as its factual statements that lack foundation and/or are conclusory. *See*

25   *Spencer v. Stapler*, 2006 WL 2052704, *2 (D. Ariz. July 21, 2006) (court need not consider

26   a plaintiff's statements that "…are only conclusory statements, when determining if the

27   plaintiff has produced enough evidence to support his claims"); *Mann v. GTCR Golder*

28   *Rauner, L.L.C.*, 483 F. Supp. 2d 884, 889 (D. Ariz. 2007) ("uncorroborated and self-

1   serving testimony or declarations" disregarded at summary judgment). Moreover, Bessler

2   relies solely on Taft's deposition testimony and/or Report to support allegations regarding

3   compensation, and conspicuously limits their scope to what Taft allegedly stated – *without*

4   *taking any position on what his compensation actually was*. Tempe objects to every such

5   factual allegation on the grounds of relevance and materiality.

6   **III.    ARGUMENT**

7            **A.    <u>Bessler was never relieved of his continuing duty to mitigate damages,</u>**
                     **<u>which required him to pursue "substantially equivalent" employment.</u>**

8                    **1.    Bessler was always obligated to diligently pursue "substantially**
                             **equivalent" employment which he did not do.**

9        A former employee "has the same duty to mitigate his damages as any victim of a

10  tort or breach of contract." *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir. 1992), citing

11  *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231, 102 S. Ct. 3057, 3065, 73 L.Ed.2d 721, 732

12  (1982) (underemployed claimant has statutory duty to minimize damages). Moreover,

13  under Title VII, an employee's duty "to mitigate damages is *not* met by using reasonable

14  diligence to obtain *any* employment. Rather, the claimant must use reasonable diligence

15  to obtain *substantially equivalent employment*." *Booker v. Taylor Milk Co.*, 64 F.3d 860,

16  866 (3d Cir. 1995) (emphasis in original); *Tubari, Ltd. v. NLRB*, 959 F.2d 451, 454 (3d

17  Cir. 1992) (employee must seek employment "substantially equivalent" to prior job).

18  "Substantially equivalent employment" affords "virtually identical promotional

19  opportunities, compensation, job responsibilities, working conditions, and status" as the

20  employee's last job. *Cassella v. Mineral Park, Inc.*, 2010 U.S. Dist. LEXIS 11272, at *13

21  (D. Ariz. 2010) (employee effectively ending job search five months after termination

22  showed failure to use reasonable diligence to mitigate) (citation omitted). Bessler argues:

23  "*no reasonable juror could find that the City of Glendale job was not a substantially*

24  *equivalent position…*" [*Id*. at p. 9] In reality, no reasonable juror could find that it was.

25                           **i.    *Status***

26       <u>Glendale hired Bessler as a *part-time* employee</u>, after Tempe had employed him

27  full-time for over eight years. As a matter of law, this renders his temporary contract work

28  with Glendale "inferior to" – and not *equivalent* to – his prior employment. *See Piutau v.*

1
2
3

*Fed. Express Corp.*, 2003 U.S. Dist. LEXIS 6830, at \*1 (N.D. Cal. Apr. 21, 2003) ("A part-time position is, by its very nature, employment of a different or inferior kind where the initial employment was full-time"). The MSJ fails to address this crucial distinction.

4
5
6
7
8
9
10
11
12
13
14
15
16
17

Moreover, <u>Glendale hired Bessler as a *temporary* contract employee, under a nine-month employment agreement</u>. Tempe always employed Bessler in an at-will position without a pre-determined expiration date. The significance of this disparity cannot be overstated. The MSJ attempts to put a positive spin on the situation, stating that Bessler's "*so-called temporary employment will last at least 2.5 years and may extend even longer, as in July 2019 Besser was asked to supervise the City of Glendale Engineering Department*." [Dkt. 84 at p. 10] It conflicts with the Wenk Report (produced after July 2019), wherein Bessler's expert: (1) stated that Bessler "*does not expect the contract to be extended past the end of the current extension period* (*October 2020*)" and (2) assumed the Temporary Contract would expire, leaving Bessler unemployed. [**Ex. G** at Wenk-0006] The temporary nature of Bessler's employment precludes it from being "substantially equivalent" to his last, as a matter of law. *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53-54 (2d Cir. 1998) (vacating compensatory damages award; employee failed to continue job search after doing temporary work, which was "just that – temporary").

### ii.    *Compensation*

18
19
20
21
22
23
24
25
26
27
28

The MSJ fails to affirmatively allege and prove up the amount of Bessler's compensation, what benefits are available to him, and his classification status (i.e. whether Glendale ever changed it from hourly to salaried). [*See* Dkt. 84] It also inaccurately asserts: "*His city of Glendale salary was but $25,000 or 14% less annually than the city of Tempe, and he enjoyed benefits in both positions.*"[*Id*. at p. 10] The alleged value of lost wages or benefits that can be considered damages have evolved over time, and are the subject of expert opinions. This general vague, conclusory allegation should not be considered, as it fails to cite the record and is without foundation: it fails to even identify the two periods in Bessler's job history between which there was such a pay gap. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)

1    (conclusory statements are insufficient and "missing facts" will not be "presumed"). The

2    MSJ's only allegations about Bessler's compensation that cite the record are ones

3    regarding *Taft's* supposed conclusions about it, and the MSJ is silent on whether Bessler

4    believes that Taft's conclusions are accurate.[4]

5         Bessler's pay during his employment at Tempe was much higher than his pay

6    during his employment with Glendale. Bessler's final position in this litigation was that

7    his final salary received as DPW was $187,138. In sharp contrast to this, Bessler's 2019

8    W-2 reflects that he earned only $124,628.21 from Glendale over his 351 days of

9    employment in 2019. Moreover, the MSJ's implication that an alleged pay reduction of

10   "only" $25,000 is insubstantial is disingenuous: if Bessler actually believed such a loss

11   was insignificant, he likely would never have initiated this lawsuit. Perhaps his newfound

12   belief that it is insignificant is the reason he refused to look for other employment.

13        Bessler also alleges he lost benefits, such as tuition reimbursement from Tempe.

14   The Temporary Contract provides that his status as "Temporary Personnel" renders him

15   *ineligible* to participate in Glendale's Education Assistance Program, or any other benefit

16   not expressly provided for that is not "required by law." [**Ex. K** at COG000004] In a

17   transparent attempt to avoid discussion of the benefits gap between the two jobs, the MSJ

18   perfunctorily states that Bessler "*enjoyed benefits in both positions*." [Dkt. 84 at p. 10].

19        Lastly, Glendale hired Bessler as an *hourly* employee, but his employment with

20   Tempe was salaried. This materially altered his compensation. *See Sitgraves v. Pickett*,

21   953 F.2d 570, 574 (9th Cir. 1992) (move from hourly to salaried "constitutes sufficiently

22   new and different contractual relationship to provide an actionable promotion claim").

### iii.    *Responsibilities*

23

24        Bessler's responsibilities in his current and former employment are radically

25   different. First, as explained above, Bessler has what are effectively two different positions

26   with Glendale, as its Chief Officer of Capital Programs (a consulting role) and Acting

27   ───────────────

28   [4] In an obvious attempt to gloss over this critical factor, Bessler omitted the Wenk Report from his exhibits to the MSJ, even though he identified it as a repository for his positions on damages.

1   Director of Engineering. As Tempe's DPW, Bessler focused on the administration of

2   public works as a whole, and commanded formidable administrative authority; he was

3   ultimately responsible for ensuring delivery of a wide array of municipal services through

4   the water utility, field operations, transportation, *and* engineering divisions. The MSJ

5   alleges no facts that show Bessler currently has a comparable degree of responsibility – or

6   *any* responsibility – over the same government functions. Moreover, <u>for at least the first</u>

7   <u>six months of Bessler's employment with Glendale, he did not even supervise employees</u>.

8   This substantial change is recognized as a material alteration in the nature of the employer-

9   employee relationship. *See Sitgraves*, 953 F.2d 570, 574 (move from non-supervisory to

10  supervisory position is "actionable basis for a section 1981 failure-to-promote claim").

11  The MSJ's analysis of this factor completely misses the mark; referring to Bessler's

12  current and former employment, it merely reads: "*Both involved employment with*

13  *municipal government administration...*" [*Id.* at p. 10] Whether two different jobs are in

14  the same overall industry or field is not a factor under the "substantially equivalent"

15  analysis; the specific duties and responsibilities of those jobs are. Here too, Bessler

16  attempts to completely gloss over the relevant "substantially equivalent" analysis.

iv.     <i><b>Working Conditions and Promotional Opportunities</b></i>

18  The MSJ fails to address either Bessler's (1) working conditions or (2) promotional

19  opportunities. Considering that Bessler is still a temporary contract employee to whom

20  Glendale has yet to offer non-temporary employment, his opportunities for advancement

21  are presumably inferior to advancement at Tempe. Notably, Bessler's Temporary

22  Contracts reflect that despite him having started employment with Glendale on January

23  14, 2019, he did not receive the first increase in his hourly pay rate (from $75 to $77) until

24  July 1, 2020, nearly one year and six months later. [**Ex. M** at COG000023-25]

**2.**     **After obtaining temporary work, Bessler failed to fulfill his**<br>**ongoing duty to pursue "substantially equivalent" employment.**

26  The MSJ insists "*the law is clear*" that Bessler "*had no continuing duty to mitigate*

27  *his damages*" once he accepted this temporary employment with Glendale. [Dkt. 84 at p.

28

12] Bessler's analysis ignores a simple rule: because his temporary contract work was not "substantially equivalent" to his prior employment, he was never discharged of his duty to mitigate damages upon accepting an offer for temporary work. *See, e.g. Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 313 (S.D.N.Y. 2009) (granting summary judgment for employer; former sales manager who ended job search upon accepting lower-paying waitress job failed to act reasonably to mitigate), citing *Greenway*, 143 F.3d at 53-54.

The MSJ asserts: "*The key issue here is whether such a claimant who accepts a lower paying job and wishes to maintain it, nevertheless has a duty to maintain a continued search for higher paying employment.*" [Dkt. 84 at p. 12] The answer is "yes" in this situation, where the lower-paying job is not "substantially equivalent" employment. In *Tubari*, the Third Circuit clarified that accepting lower-paying interim employment does *not* discharge one's duty to continue searching for "substantially equivalent" employment:

> However, while the Board and the courts have sanctioned a discriminatee's acceptance of a lesser paying job, we are aware of no case in which a discriminatee has been held to have reasonably mitigated damages by immediately lowering his or her sights in terms of remuneration without first undergoing a reasonably diligent, good faith effort at securing substantially equivalent employment. Here the discriminatees made no effort at all to secure substantially equivalent employment, and thus we could uphold the Board only by significantly altering the equation of rights and responsibilities regarding mitigation following an unlawful discharge. We decline to do that.

959 F.2d at 453. The threshold issue is whether the former employee obtained "substantially equivalent" work. The fact that they may want to remain in a lower-paying job (as in this case) does not discharge their duty to mitigate damages. *See Tubari, supra.*

**B.    Once he obtained temporary work, Bessler failed to mitigate damages.**

**1.    Bessler's willful abandonment of his job search constituted a failure to mitigate damages.**

Without citing authority, the MSJ states: "[*t*]*herefore, the standard for mitigation in the Ninth Circuit requires that a defendant employer provide* ***both*** *evidence regarding the plaintiff's efforts to find employment and the availability of employment…*" [Dkt. 84 at p. 8 (emphasis in original)] Bessler ignores that under these circumstances – where it is indisputable that he outright abandoned his job search in November 2018 – Tempe is not required to prove up the job availability element to sustain its failure-to-mitigate defense.

1      To establish the failure-to-mitigate defense and thereby preclude liability for lost

2   wages, an employer "generally carries its burden by demonstrating (1) that suitable work

3   existed, and (2) that the employee did not make reasonable efforts to obtain it."

4   *Arbercheski*, 650 F. Supp. at 313 (citation omitted). An equally well-recognized rule is

5   that the employer is excused from having to establish availability of other employment if

6   the employee made *no* reasonable efforts to seek such employment after a certain date. *See*

7   *id*.; *Tubari,* 959 F.2d 451, 459 n.10.

8      In *Arbercheski*, the plaintiff worked as a sales manager for the defendant until her

9   separation in June 2003. 650 F. Supp. 2d  at 310. She attempted to obtain similar positions

10  with other companies over the next 11 months, and although she ultimately interviewed

11  or spoke with several prospective employers, none hired her. *Id*. at 310-311. In May 2004,

12  she accepted a job as a waitress, and "ceased all efforts to obtain other employment

13  comparable to her former job." *Id*. at 311, 313. After she brought a retaliation claim, the

14  defendant moved for summary judgment on damages based on her failure to mitigate. *Id*.

15  at 311-312. After acknowledging that employers *generally* need to prove availability of

16  comparable work, the district court what it called the "*Greenway* exception":

17      *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998), established an
        exception to these two requirements, holding that "[a]n employer…is released from
18      the duty to establish the availability of comparable employment if it can prove that
        the employee made no reasonable efforts to seek such employment." *Id*. at 54 (the
19      "*Greenway* exception"). The rationale for the exception "is that an employer should
        not be saddled by a requirement that it show other suitable employment in fact
20      existed – the threat being that if it does not, the employee will be found to have
        mitigated his damages – when the employee, who is capable of finding replacement
21      work, failed to pursue employment at all."
        …
22      Oracle is entitled to summary judgment on any claim for back or front pay dating
        from May 2004, based on Arbercheski's failure to undertake *any* reasonable efforts
23      since accepting the waitress position to secure comparable employment.

24  *Id*. at 313-315. The district court rejected the plaintiff's argument that her decision to stop

25  searching for a job was reasonable, because while the law does not require success in a job

26

27

28

1    search, it *does* require reasonable efforts. *Id*. at 314.[5] It granted summary judgment on all

2    claims for lost wages that accrued on or after the date she accepted their new job. *Id*.

3            The "mitigation-defense exception" applied by the Second Circuit in *Greenway*

4    (dubbed the "*Greenway* exception" in *Arbercheski*) is widely followed. *See,* e.g. *Quint v.*

5    *A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999) (adopting mitigation-defense

6    exception, as other appellate courts "uniformly have relieved the defendant-employer of

7    the burden to prove" availability of jobs if "the former employee made no effort to secure

8    suitable employment"); *Tubari,* 959 F.2d 451 at 454 (if employee "exercised no diligence"

9    after a certain date, the availability of work is irrelevant") (internal quotation omitted);

10   *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991); *Sellers v. Delgado*

11   *Coll.*, 902 F.2d 1189, 1191-1193 (5th Cir. 1990), *cert. denied*; *NLRB v. Madison Courier,*

12   *Inc.*, 153 U.S. App. D.C. 232, 472 F.2d 1307, 1319 (1972) ("With such diligence lacking,

13   the circumstance of a scarcity of work and the possibility that none would have been found

14   even with the use of diligence is irrelevant") (citation omitted).

15           Tempe is unaware of any decision in which the Ninth Circuit Court of Appeals

16   actually rejected the mitigation-defense exception, and in fact, district courts in the Ninth

17   Circuit have applied the exception in recent years. In *Moore v. Lowe's Home Ctrs., LLC*,

18   2016 U.S. Dist. LEXIS 96218 (W.D. Wash. July 22, 2016), when the Washington District

19   Court denied the employee's motion for summary judgment on the failure-to-mitigate

20   defense, it acknowledged that courts in the Ninth Circuit have excused employers from

21   proving "job availability." *Id*. at *31-32, citing *Caudle v. Bristow Optical Co.*, 224 F.3d

22   1014, 1019 (9th Cir. 2000) (affirming reduction of award for lost wages, as "it was

23   undisputed that [employee] voluntarily left the workforce…"), *Wurts v. City of Lakewood*,

24   2015 U.S. Dist. LEXIS 56337 (W.D.Wash.2015) (excusing employer from having to

25   establish availability of comparable employment for failure-to-mitigate defense).

26   _____

27   [5] Similarly, courts require "an honest, good faith effort" to mitigate. *See Logan v. Pena*, 1993 U.S.
     Dist. LEXIS 2916, at *11-12 (D. Kan. Feb. 9, 1993) (the court "does not need to consider in the
     abstract whether or not a suitable position for which the plaintiff is qualified might have
28   been offered" if he never "made the necessary effort to find it").

1    The MSJ never addresses the mitigation-defense exception, but asserts the general

2    proposition that the Ninth Circuit "recognizes the two-prong test," and cites two Ninth

3    Circuit Court of Appeals decisions – neither of which rejected the mitigation-defense

4    exception. [Dkt. 84 at p. 7] In *Odima v. Westin Tucson Hotel*, 53 F.3d 1484 (9th Cir. 1995),

5    Westin (the employer) argued on appeal that a "post-trial deposition" had revealed that the

6    plaintiff "failed to look for work" – thereby rendering the job availability irrelevant. *Id.* at

7    1497. The Court did <u>not</u> reject the argument that job availability is irrelevant under such

8    circumstances. *Id.* It refrained from deciding whether to adopt the mitigation-defense

9    exception, because there was no factual predicate to justify applying it: a trove of evidence

10   contradicted Westin's allegation that the plaintiff "failed to look for work," so "Westin

11   fail[ed] to satisfy the rule that it urge[d]." *Id.*  Similarly, in *EEOC v. Farmer Bros. Co.*, 31

12   F.3d 891, 906 (9th Cir. 1994), the Court merely affirmed a grant of partial summary

13   judgment for the employer; it never even considered the mitigation-defense exception –

14   which, like in *Odima*, would have been completely unnecessary in light the facts – and the

15   opinion never suggests that the employer even argued for it. The MSJ also cites *Kawar v.*

16   *JPMorgan Chase & Co.*, 2009 U.S. Dist. LEXIS 51893 (D. Ariz. June 16, 2009), where

17   the district court declined to apply the mitigation-defense exception. In *Kawar*, the

18   employer did "not allege that Kawar remained completely idle," and merely argued that

19   his efforts were "minimal." *Id*. at *17. Here, it is undisputed that Bessler did in fact remain

20   completely idle with respect to his job search, starting November 31, 2018. Tempe's

21   argument is fundamentally and materially different.

22    The Ninth Circuit decided *Caudle* after *Odima* and *Farmer Bros*. In *Caudle*, the

23   Court affirmed a grant of summary judgment in favor of the employer, after the district

24   court held that the employee had failed to mitigate damages by failing to pursue any

25   employment opportunities after her termination and voluntarily removing herself from the

26   workforce. 224 F.3d at 1019. The employee challenged this ruling on appeal, arguing that

27

28

1  the employer had failed to establish the mitigation of damages defense by showing the

2  availability of other jobs. *Id*. at 1021 n.3. The Court disposed of the argument in a footnote:

3  Caudle argues in the alternative that Bristow failed to meet its burden of
   demonstrating that she had failed to mitigate her damages because it had not
4  established that there were comparable jobs available that she had failed to
   pursue. Bristow relied on the submission of classified employment advertisements
5  with large numbers of postings for positions facially comparable to Caudle's. Other
   circuits have upheld determinations that comparable work was available on similar
6  evidence. *See, e.g.*, *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995). The
   district court did not err in relying on such evidence here.

7  *Id.* At best, *Caudle* gave minimal weight to the notion that an employer must show the

8  availability of jobs where it is undisputed that the employee failed to pursue employment

9  during a given period. Moreover, to the extent any such showing is necessary here, *Caudle*

10 establishes that postings for "facially comparable" positions would satisfy it. *Id*.

11      This case involves atypical circumstances; there is no dispute that Bessler ceased

12 efforts to find alternative employment after November 2018. This is precisely the kind of

13 case where the court should apply the mitigation-defense exception so that proof of other

14 employment being available after November 2018 is not required – or at the very least,

15 require minimal proof of this, as addressed in *Caudle*. 224 F.3d at 1020-21 (allowing

16 eligibility for backpay for periods when employee voluntarily failed to mitigate damages

17 allows them to be "more than made whole").

18              **2.    Even if the mitigation-defense exception did not apply, there is
                       evidence sufficient to establish the failure-to-mitigate defense.**
19

20      Even if the mitigation-defense exception did not apply, and Tempe needed to prove

21 up the "job availability" prong of the general analysis, it still has sufficient evidence to

22 establish the failure-to-mitigate defense.

23      Bessler failed to use reasonable (any) diligence to pursue "substantially equivalent"

24 employment after November 2018. To the extent any showing of comparable employment

25 is necessary here, postings for positions "facially comparable" to Bessler's old DPW

26 position would satisfy it. *See Caudle,* 224 F.3d at 1021 n.3; *Booker,* 64 F.3d at 864

27 (upholding determination that comparable work was available based on similar evidence).

28 Taft's Declaration – like his Report – is accompanied by postings for jobs that (1) are

1    facially comparable to Bessler's former DPW position; (2) are ones he was qualified to

2    perform; and (3) are ones he could have applied for in or after November 2018. [*See*

3    **Exhibit J** at ¶¶ 6-7]. These include postings for jobs within Arizona (including for an

4    Assistant City Manager position with Glendale), as well as California.

5            The MSJ asserts that "[*a*]*s a matter of law, the job opportunities outside of the State*

6    *of Arizona and per the case law above even outside the Phoenix metropolitan area are*

7    *irrelevant...*" [Dkt. 84 at p. 9] This contention is incorrect. Bessler has not cited any case

8    law to support his argument that there is such a bright-line. Reasonableness is the

9    touchstone in determining whether the plaintiff did enough to mitigate damages, and it

10   depends on each individual case. *Arbercheski*, 650 F. Supp. 2d at 313. Bessler's own

11   actions and job history completely contradict his position that it would be unreasonable to

12   expect him to pursue other regional or even national job opportunities, such as those

13   identified in California. Bessler pursued multiple jobs outside of the Phoenix Metropolitan

14   area (e.g. in Cottonwood, Arizona). Bessler even pursued a job in Wisconsin, and in doing

15   so, expressed his willingness and desire to relocate there for a "*desirable opportunity*." In

16   fact, his acceptance of temporary employment with Glendale was the first time in his

17   career that he accepted employment *without* relocating new state. His arguments are *per*

18   *se* unreasonable, in light of his actions.

19   **IV.    CONCLUSION**

20           Tempe respectfully requests that the Court deny the MSJ in its entirety.

21           DATED this 11th day of February, 2021.

22                                                   JACKSON LEWIS P.C.

23                                                   By: */s/ J. Greg Coulter*
                                                         J. Greg Coulter
24                                                       J. Alexander Dattilo
                                                         *Attorneys for Defendant*
25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 11, 2021, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrants:

Tod F. Schleier
Bradley H. Schleier
SCHLEIER LAW OFFICES, P.C.
3101 N. Central Avenue, Suite 1090
Phoenix, Arizona 85012
tod@schleierlaw.com
brad@schleierlaw.com

*Attorneys for Plaintiff*

By: */s/ Debbie Mattatall*

4832-4658-6331, v. 1