J. Greg Coulter (State Bar No. 016890)
J. Alexander Dattilo (State Bar No. 030112)
**JACKSON LEWIS P.C.**
2111 East Highland Avenue, Suite B-250
Phoenix, AZ 85016
Telephone: (602) 714-7044
Facsimile: (602) 714-7045
Greg.Coulter@jacksonlewis.com
Alexander.Dattilo@jacksonlewis.com
*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Donald Bessler, a married man, | Case No: 2:19-cv-04610-MTL |
| Plaintiff, | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | **(Assigned to the Honorable Michael T. Liburdi)** |
| City of Tempe, an Arizona municipal corporation, | **Oral Argument Requested** |
| Defendant. | |

Pursuant to Fed. R. Civ. P. 56, defendant City of Tempe ("Defendant" or "Tempe") moves for summary judgment on the claim asserted by plaintiff Donald Bessler ("Plaintiff," or "Bessler") in his complaint (the "Complaint").

From 2010 to 2018, Bessler worked as Director of Public Works ("DPW") for Tempe. He eventually reported to Deputy City Manager ("DCM") Steven Methvin ("Methvin"), who reported to City Manager Andrew Ching ("Ching"). Ching became concerned about problems in the Public Works Department (the "Department"), which he felt evidenced issues with Bessler's leadership and an inability to manage his Department. On September 6, 2018, Bessler told Methvin that he wanted to leave his job at Tempe, and also wanted a severance package. Methvin immediately reported this to Ching, who also wanted separation. On September 10, Ching, Methvin, and DCM Ken Jones ("Jones") met and agreed that Bessler's employment would end, and further decided that to finalize his separation, Methvin would identify Bessler's preferences for

a severance package. Bessler evaded Methvin's early attempts to discuss separation – and following their short discussion about it on September 21, Bessler organized a meeting on September 24 with his wife, Methvin, and City Attorney Judith Baumann ("Baumann"), where he denigrated Ching, reiterated that he was leaving his job, made demands for severance, and (falsely) claimed to have filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging age discrimination under the Age Discrimination in Employment Act ("ADEA"). No agreement on severance was reached, and November 2, 2018 was Bessler's last day of physical employment. He filed claims under the ADEA for age discrimination and retaliation, but withdrew the former.

Tempe is entitled to summary judgment, as a matter of law, on: (1) liability, for Bessler's retaliation claim, and (2) damages incurred on or after November 31, 2018. His retaliation claim fails for several reasons. He never even engaged in "protected activity," as his alleged belief that disparate treatment attributable to experience violated the ADEA was not an objectively reasonable one. Moreover, Bessler's filing of a charge was merely a transparent attempt to gain leverage for severance discussions with Tempe after: (1) the decision to separate his employment was already made; (2) he and Ching had both expressed a desire for separation; and (3) he had initiated negotiations for a potential severance package. Undisputed evidence shows that separation was a forgone conclusion when Bessler finally filed a charge on September 25, so there was clearly no but-for causation. Regarding damages, Tempe's Response to Bessler's "Motion for Partial Summary Judgment Re: Affirmative Defense of Mitigation of Damages" (the "PMSJ Response") explains that he prematurely ended his job search in November 2018, and therefore failed to mitigate any damages he subsequently incurred.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    UNDISPUTED FACTS

#### A.    Bessler's Hiring and Initial Years of Employment

Tempe hired Bessler in 2010 to manage its public works department as DPW, and he remained in the position until his separation. [**Ex. 1** at 21:25–22:5, 138:18–139:13] In

2013, Tempe City Council appointed Ching as City Manager. [**Ex. 2** at 10:21–11:5] Ching held authority as final decision-maker on employment matters involving senior management personnel like Bessler, and he made decisions on hiring, termination, and discipline. [**Ex. 2** at 70:12–71:3] He appointed Methvin and Jones as DCMs. [*Id.* at 15:21-25; **Ex. 3** at 11:3-5] Methvin supervised Bessler and reported directly to Ching. [**Ex. 1** at 94:25–95:3; **Ex. 3** at 15:23–16:1]

### B. Employment Issues Preceding Bessler's Separation

Ching expressed his concerns about Bessler's leadership and management long before Bessler claims he first engaged in "protected activity." For example, Bessler's own affidavit reads: "*On September 6, 2018, Methvin called for an unplanned meeting in my office and began to describe that Ching was angry at me and had concerns about my leadership*." [**Ex. 4** at DB-0049] One such concern of Ching's related to "groveling":

> MR. SCHLEIER: Going back to the interrogatory, what other numerous incidents are you aware of wherein Mr. Bessler failed to follow direction from his supervisors?
>
> MR. CHING: …the one that leaps out in my mind is the manner in which Public Works handled the ability for employees who received time off as discipline, as days off, that there was a practice and a direction in Public Works to require employees who wished to use vacation in lieu of unpaid leave off, that they had to appear to the director, Mr. Bessler, and to admit that what they had done was wrong, and that it had begun to be known colloquially as the groveling rule that existed only within Public Works and only at the direction of Mr. Bessler. It caused a great deal of concern from our employee bargaining units, the City's unions, in that we had had conversations at a director level that that was inappropriate and that that shouldn't happen.
> …
> …I was in, to my recollection, group meetings where Mr. Bessler was present where we discussed and disapproved of that type of method of causing employees to, at least by characterization, to grovel for the ability to use vacation in lieu of unpaid leave in disciplinary matters.

[**Ex. 2** at 86:5–87:2, 87:22–88:2] Ching also testified that he harbored concerns about other practices within Public Works that persisted under Bessler's leadership:

> MR. SCHLEIER: And can you describe for me each instance where Mr. Bessler operated his department in a manner inconsistent with City practices, other than the so-called groveling rule that you have previously testified to?
>
> MR. CHING: Yes. In no particular order, I would say that his creation of a significant degree of bureaucracy within Public Works that involved the delegation of what would traditionally be HR duties and responsibilities to individuals who worked as executive or management assistant level employees

within Public Works was a significant departure from the manner in which other City departments were run.

It was my impression that Mr. Bessler over time had created a structure, a bureaucratic structure, within Public Works that was untenable, because it created a lot of duplication of effort and at times seemed and appeared to me to be an attempt to circumvent the practices of Human Resources to create operating procedures that were unique [to] Public Works, whether or not they were consistent with practices and policies in other parts of the City, up to and including our City's personnel rules. That was of significant concern, that he operated his department in that manner.

…I was concerned that he or his Department or an area, I should say, a Division under Mr. Bessler's control as the Director of Public Works, would hire as a manager in Solid Waste, an individual such as Amy Marschel. While she may be professional and experienced in certain areas, she didn't have any previous public sector experience in Public Works to my knowledge and appeared to be a hire that was done because she was close personal friends with the Bessler family. I thought that that was a significant departure from the manner in which we should conduct City business, to hire people who are your friends. It was a concern to me. And it seemed to be consistent with some of what I was hearing about in Field Services and Solid Waste that Messrs. Browne and Miano also had a practice of hiring people who appeared to be their friends and associates from other parts of the Valley and other agencies, which sort of perpetuated this idea that hiring people on the basis of friendship as opposed to merit was a concern that I would say would be inconsistent with City practices, because we as a City are supposed to be a merit-based system for hiring...

[**Ex. 2** at 89:24–91:22] Ching also felt Bessler administered discipline inconsistently; he felt Bessler advocated for an overly-harsh termination of Holly Rosenthal, yet failed to impose meaningful discipline for conduct worse than Rosenthal's. [*Id.* at 88:15-20, 89:1-19] Ching learned that Bessler interviewed for an Assistant City Manager position with City of Chandler in summer of 2018. [**Ex. 1** at 142:25–143:18; **Ex. 2** at 49:23–50:12]

## C.    Bessler's September 6, 2018 Resignation Notice

On September 6, 2018, Methvin met with Bessler in his office. [**Ex. 5**; **Ex. 1** at 83:4-9; **Ex. 6** at DB-004; **Ex. 3** at 69:24–70:1] Methvin expressed concern over Bessler's job security, in light of concerns Ching had expressed about him. [**Ex. 6** at DB-0004; **Ex. 7** at DB-0478, 485; **Ex. 1** at 61:23–62:8, 81:8-23; **Ex. 3** at 73:3-13] After Methvin told Bessler that he was "*on thin ice*" with Ching, Bessler said that he felt "*broken down*" and in an "*intolerable*" employment situation. [**Ex. 6** at DB-004; **Ex. 1** at 53:16-21, 83:10-19; **Ex. 3** at 72:16–74:11] He expressed that he wanted to leave his job with Tempe, and with a severance package to "*at least get to retirement.*" [**Ex. 1**

4

1  (*Bessler*) at 53:10–54:14; 83:10–84:4; **Ex. 3** at 73:14–74:23, 77:1-9] Methvin told him

2  to consider terms for a severance package. [**Ex. 27** at ¶5]

3      Methvin met with Ching and informed him that Bessler said he wanted to leave

4  his job at Tempe with a severance package. [**Ex. 5** at TEMPE.002580; **Ex. 3** at 83:2-6;

5  **Ex. 2** at 77:12-18, 78:16-18] Ching saw this as a positive development, because by then,

6  his pre-existing concerns about Bessler had caused him to independently conclude that

7  their employment relationship should end. [**Ex. 2** at 78:19–79:5, 79:13–80:23; **Ex. 28** at

8  ¶¶ 5-7] Ching wanted Bessler's exit from Tempe to be amicable, but he also did not

9  want it prolonged, as he had significant concerns about Bessler continuing in the DPW

10  position. [**Ex. 2** at 78:19–80:23; **Ex. 28** at ¶ 8] Methvin said he would try to follow up

11  with Bessler the next week. [**Ex. 3** at 77:21-24; 83:23–84:5; **Ex. 2** at 79:20–80:23]

12      **D.**      **Methvin's Efforts to Continue Separation Discussions with Bessler**

13      Ching, Methvin, and Jones met on September 10, 2018, and all agreed that due to

14  both Bessler having expressed a desire to leave his job *and* the many serious issues that

15  had arisen in Public Works under his leadership and management, that they should

16  separate his employment. [**Ex. 8**; **Ex. 27** at ¶ 6; **Ex. 2** at 79:20–80:11; **Ex. 28** at ¶ 9; **Ex.**

17  **29** at ¶ 5] Ching asked Methvin to meet with Bessler to learn what terms he wanted in a

18  severance package (*e.g.*, his end date). [**Ex. 27** at ¶ 7; **Ex. 2** at 79:20–80:23; **Ex. 29** at ¶

19  6] Within 24 hours of the meeting, Jones disclosed the forgoing to his direct report,

20  Internal Services Director Rene Broderick ("Broderick") – who is older than Bessler.

21  [**Ex. 29** at ¶ 8; **Ex. 30** at ¶¶ 2-4]

22      Between September 10 and September 24, 2018, Methvin tried, unsuccessfully, to

23  meet privately with Bessler to discuss separation. [**Ex. 3** at 84:6-16; **Ex. 2** at 80:24–

24  81:13] They originally agreed to meet one-on-one on September 12 and 19, but both

25  meetings were cancelled. [**Ex. 1** at 92:9-13; **Ex. 27** at ¶ 8]

26      On September 21, 2018, while both were attending the Tempe City Council

27  Retreat at Arizona State University, Methvin asked Bessler to meet with him privately.

28  [**Ex. 9** at DB-0018; **Ex. 1** at 93:2-22; **Ex. 27** at ¶ 10] Once the two entered a private

room, Methvin stated that he wanted to continue their September 6 discussion about his separation. [**Ex. 1** at 93:10-22; **Ex. 27** at ¶ 11] In response, Bessler said "*Please don't bum me out*" and asked to postpone the meeting until the next week, and Methvin granted his request. [**Ex. 27** at ¶ 11] Ching asked Methvin that day via text message if he "*had talked to*" Bessler, and Methvin responded: "*We committed to talk early next week. He's worn out*" – and then wrote: "*We will get to a good place as long as we don't rush it. I appreciate that we have some time…*" [**Ex. 10** at TEMPE.002594; **Ex. 27** at ¶ 12]

> ### E.    September 24, 2018 Severance Negotiation Meeting

Bessler organized a meeting in his office for the afternoon of September 24, 2018, which was attended by Methvin, Baumann, and Mary Bessler – Bessler's wife. [**Ex. 11** at TEMPE002508; **Ex. 1** at 45:5-10; **Ex. 3** at 84:17-21; **Ex. 12** at 41:5-15] There, Bessler criticized Ching and called him a "*weak leader*," and declared that he had numerous affidavits, as well as a letter about Ching that was "*some of [his] finest work.*" [**Ex. 13** at TEMPE.002659; **Ex. 13** at 85:11-12; 86:18–87:9, 106:14-16] Consistent with Bessler's prior statements to Methvin and Tempe's prior decision to separate his employment, Bessler also said he wanted to talk about how to leave his job at Tempe, and stated that he did not feel he could continue working for Tempe, "*wanted to leave the city*," and intended "*to find a soft exit out of the city at that point.*" [**Ex. 1** at 54:5-14, 85:10-13, 87:6-12; **Ex. 14** at 14:4-7, 17:17-19, 19:15-19, 23:9-12; **Ex. 3** at 85:13-15; **Ex. 12** at 42:8-11] He concedes this was an "*utterance of him trying to resign or retire.*" [**Ex. 1** at 85:8-13] In "*present*[*ing*] *an exit strategy*," he demanded a severance package with cash compensation equivalent to a full year of his salary, plus Tempe's "*purchase of 14 months of service*" to allow him to obtain a "*full 10-year benefit from ASRS.*" [**Ex. 15** at DB-0412; **Ex. 13** at TEMPE.002659; **Ex. 1** at 87:16-19, 94:16-18; **Ex. 14** at 21:2-5; **Ex. 3** at 84:22–85:15, 93:2-5, 101:16-24; **Ex. 12** at 42:8-17, 43:3-11] Bessler also stated there was "a curveball" – and disclosed that he had filed a charge with the EEOC alleging age discrimination. [Dkt. 14 at ¶ 52; **Ex. 15** at DB-0413; **Ex. 1** at 77:9-13; **Ex. 27** at ¶ 14; **Ex. 12** at 42:18-23] Bessler added that he would withdraw the charge if

Tempe met his demands for a severance package. [**Ex. 13** at TEMPE.002662; **Ex. 1** at 45:5-24; **Ex. 3** at 92:24–93:5] In reality, Bessler had not even signed a charge. [Dkt. 14 at ¶ 52; **Ex. 16**] Regardless, no one at Tempe was aware that Bessler even *intended* to file a charge before this meeting. [**Ex. 1** at 77:9-16] It ended when Baumann and Methvin told Bessler that they would inform Ching of his demands. [**Ex. 12** at 44:16-21]

Methvin and Ching then exchanged the following messages:

> METHVIN: Are you able to meet at 5 to discuss Bessler's exit strategy?
> CHING: Yes, I will be back by then. Just you and me, or the three of us?
> METHVIN: Bessler will not attend but Judi will. We just met with him. Don invited her.
> CHING: Ok. How did he know it was the kind of meeting he want to invite Judi?
> METHVIN: Because I've been talking with him since I meet with Ken and you. **He is aware of where this was going**. He trusts Judi.
> CHING: Got it. **Wasn't sure how much was shared**.
> METHVIN: Have you met me? I'm not exactly subtle.
> CHING: Very true.

[**Ex. 10** at TEMPE.002595-96 (emphasis added); **Ex. 27** at ¶ 15] That day, Methvin and Baumann met with Ching and summarized their meeting with Bessler. [**Ex. 11** at **TEMPE.002507**; **Ex. 3** at 94:1-6; **Ex. 12** at 45:12-21] After that, Methvin asked Bessler via text message if he filed the Charge, and Bessler responded that he had, before writing: "*Well if the city wants to negotiate then I will withdraw it. But I'm not going to get fired.*" [**Ex. 17** at TEMPE.001017-18; **Ex. 3** at 95:19–96:25] Methvin later wrote: "*Are you free to talk?*," and Bessler responded: "*Yes but don't bum me out.*" [**Ex. 17** at TEMPE.001019; **Ex. 3** at 95:19–96:25]

### F.    Bessler's September 25, 2018 Charge

Bessler wrote a 14-page letter dated September 11, 2018 to an EEOC employee, which addressed various events involving Ching and others, and stated in part:

> October 20, 2017 – …I asked [Ching] why he routinely uses me as the recipient of his criticisms at his staff meetings in matters that he had disappointments with; he indicated that he was making a point to others and that he believed that based on my experience that I could handle it…

[**Ex. 7** at DB-0481] Bessler later signed a three-page Charge on September 25, 2018 (the "September Charge"), wherein he asserted age discrimination, alleging that "*upon*

*information and belief*," Ching treated Bessler differently than "*similarly situated peers*" because he was "*the most experienced employee*," and (Bessler surmised) "[*e*]*xperience only comes with age*." [*See* **Ex. 16**] Tempe did not receive a Notice of Charge from the EEOC until on or after October 3, 2018. [*See* **Ex. 26** at EEOC-0044]

### G.     Subsequent Severance Negotiation Meetings

Methvin and Baumann met with Bessler again on September 26, 2018, where they explained that his demands were unacceptable to Ching, made a counteroffer, and said his final date of employment would be in 2018. [**Ex. 19** at DB-0026; **Ex. 1** at 45:5-10, 118:25–119:4; **Ex. 3** at 97:11–100:17; **Ex. 12** at 45:12–46:4, 47:2-17] Bessler then said he would "*need money to get out of here*," as if he believed his employment would continue until he agreed to a severance package.[1] [**Ex. 13** at TEMPE.002662; **Ex. 3** at 98:10-13, 99:4-100:1; **Ex. 27** at ¶16] Methvin and Baumann reminded him that he had already told them he wanted to resign, and they clarified that the decision on separation had not changed. [**Ex. 19** at DB-0026; **Ex. 27** at ¶ 16]

Bessler was absent from work from October 1 through October 10, and apparently on vacation. [**Ex. 14** at 32:2-13; **Ex. 12** at 47:19-21] On October 11, Methvin and Baumann attended another meeting organized by Bessler, where they again tried to negotiate a severance package. [**Ex. 20**; **Ex. 12** at 47:22–48:11]

### H.     Bessler's Separation and Premature Termination of Job Search

On October 17, 2018, Methvin and Baumann met with Bessler again, and notified him that his last day of physical employment with Tempe would be November 2, with an effective separation date of November 9.[2] [**Ex. 21**; **Ex. 4** at DB-0049; **Ex. 1** at 77:17-20; **Ex. 3** at 101:25–102:20; **Ex. 12** at 49:9-18] Two days later, Bessler filed another EEOC charge, wherein he alleged Tempe had retaliated against him by terminating his employment. [*See* **Ex. 22**] On or around November 31, he prematurely terminated his

---

[1] Bessler's <u>affidavit dated September 27, 2018 states</u>: "<u>*In the same September 24th meeting I offered that if we could not come to mutually agreeable terms then I intended to continue my employment at least until my 10[-]year anniversary or possibly after.*</u>" [**Ex. 19** at DB-0026]

[2] Tempe Department Directors (like Bessler) are not covered by any progressive discipline policy. [**Ex. 23** at 23:12–24:16; **Ex. 30** at ¶ 7]

job search – the facts of which are in Tempe's Response to Bessler's Motion for Partial Summary Judgment ("MPSJ"), incorporated herein with all prior filings. [*See* Dkt. 94]

## I.    Bessler's Lawsuit

On July 2, 2019, Bessler filed a complaint in District Court, wherein he asserted claims under the ADEA for age discrimination and retaliation. [Dkt. 1] He subsequently withdrew the age discrimination claim in filing his Second Amended Complaint (the "Complaint"), presumably because he lacked evidence to prove it. [Dkt. 14]

When asked during his deposition to explain why he had supposedly believed he was treated less favorably due to his age, Bessler identified only alleged statements regarding his experience: (1) Ching's alleged statement that "*he didn't think he was ridiculing* [*Bessler*] *but that he did use* [*Bessler*] *to send messages to the other directors because Bessler had more experience and* [*Bessler*] *could take it*"; and (2) Methvin's alleged assertion that Ching treated Bessler differently "*because of* [*Bessler's*] *experience.*" [**Ex. 7** at DB-0491; **Ex. 1** at 39:18–40:25, 65:3–66:23] No manager told Bessler that he was treated less favorably due to his age; he merely inferred this:

PLAINTIFF:…I felt that my age, [Ching] didn't respect my age and experience and treated me accordingly.

MR. COULTER: What made you feel that he didn't respect your age?

A. My supervisor, Steven Methvin, told me that I get treated poorly by Andrew because of age. I felt in many, many staff meetings that he held, that he targeted me for criticism and humiliation, and I was the oldest person sitting in the room at those staff meetings.

Q. Well, just tell me: at some point Steven Methvin told you what about your age?

A.…I went to my supervisor, Steven Methvin, to try to get relief from the intolerable situation, and he was always very empathetic, and he said that Andrew treats me this way because of my experience and because of my experience, I should be able to take it. And he was using me to make a point. I interpreted that to mean that I was Andrew's pinata. He could be on me in order to do things, send messages to other people that he maybe wanted to send messages to, but chose me as his mechanism to do that.

Q. Alright. So Steve Methvin – **did Steven Methvin ever say age, or did he say experience, and you took the word to mean age**?

A. **I think that he used the word experience**, but in a conversation with him, I said to Steve, I remember saying this, well Steven, how did you get experience? It's through age…

…

Q. Do you have any other specific date that you can recall in which Andrew Ching mentioned the word "experience" to you?"

A. In that meeting I have documented somewhere in here. It was in August. It was a similar conversation, and yes, his response was similar.

Q. That you have experience?

A. Yes.

Q. **Did Andrew Ching ever mention age to you**?

A. **I would just say I can't recall if he used that exact word**, but I will say that my impression was because of my age and experience, this is why I get treated the way I do.

[**Ex. 1** at 39:18–40:25, 66:16–67:3 (emphasis added)] When asked what other evidence would show that he was treated differently due to either his age or experience, Bessler identified only three witnesses – former co-workers Sylvia Moir, Chad Weaver, and Carla Sidi – whom he said "*shared and confirmed*" his "*impression*," as they "*came to the same conclusions that* [*he*] *did.*" [*Id.* at 67:7-20; *see id.* at 67:21–72:25] None have personal knowledge of any statement suggesting Bessler was treated differently because of *either* his age or experience. [*See id.*] In other words, other than Ching's and Methvin's alleged statements, the only evidence of age discrimination that Bessler ever had were three people's opinions. He even acknowledges there "*could have been any number of reasons that motivated* [*Ching*] *to treat him*" in an allegedly disparate manner. [*Id.* at 73:2-22] Despite this, he claims he was treated differently due to <u>both</u> "age *and* experience." [*Id.* at 66:25–67:3, 72:17-25, 73:3-23]

## II.    LEGAL STANDARD

When the moving party makes a *prima facie* showing that no genuine issue of material fact precludes summary judgment, the burden shifts to the opposing party to identify evidence to the contrary. *Molever v. Roush*, 152 Ariz. 367, 732 P.2d 1105 (App. 1986). The non-moving cannot carry this burden merely by pointing to self-serving assertions. *Florez v. Sargeant*, 185 Ariz. 521, 526, 917 P.2d 250, 255 (1996).

## III.    LEGAL ARGUMENT

Summary judgment for Tempe is warranted, because Bessler cannot (1) identify any genuine issue of material fact or (2) satisfy the legal elements of retaliation.

For retaliation claims brought under the ADEA, the Ninth Circuit applies the same analytical framework applicable to Title VII retaliation claims. *See Hashimoto v.*

*Dalton*, 118 F.3d 671, 675 n.1 (9th Cir. 1997). To establish a *prima facie* case of retaliation, the employee must demonstrate that: (1) he engaged in "protected activity"; (2) the employer subjected him to a materially adverse employment action; and (3) the employer would not have taken that adverse employment action, but for a design to retaliate. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 364, 133 S. Ct. 2517, 2535, 186 L. Ed. 2d 503 (2013) (employee must show "but for" causation to satisfy third element); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 646 (9th Cir 2003). If a plaintiff establishes a *prima facie* case of retaliation, the burden shifts back to the defendant to set forth a legitimate, non-retaliatory reason for its actions. *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). The plaintiff must then ultimately produce evidence to show the stated reasons were a pretext for retaliation. *Id*.

A.  **Bessler cannot establish a *prima facie* retaliation case under Title VII.**

1.  **Bessler never engaged in "protected activity."**

Bessler alleges that he first engaged in protected activity on September 24, 2018 by disclosing to Methvin and Baumann that he had "*contacted the EEOC to file a charge of discrimination*" – and fails to allege that he actually filed a charge by that date. [Dkt. 14 at ¶ 60] This was not "protected activity," as Bessler never had an objectively reasonable belief that he was complaining of conduct that actually violated the ADEA.

An employee engages in "protected activity" if he (1) opposes conduct that he reasonably believes to be an unlawful employment practice, or (2) participates in an EEOC investigation or hearing. 42 U.S.C. § 2000e–3(a). "The mere fact that an employee is participating in an investigation or proceeding involving charges of some sort of discrimination, however, does not automatically trigger the protection afforded under section 704(a); the underlying discrimination must be reasonably perceived as discrimination prohibited by Title VII." *Learned v. Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). "Under *Learned*, complaints about conduct are not protected for purposes of a retaliation claim unless the conduct 'fairly fall[s] within the protection of Title VII.'" *Maner v. Dignity Health*, 350 F. Supp. 3d 899, 908 (D. Ariz. 2018). The standard is an

objective one. *See id.* (granting summary judgment on retaliation claim; employee's complaint of sex discrimination based on supervisor's sexual favoritism of co-worker was not founded on "objectively reasonable belief that Defendants' conduct violated Title VII," as it was not recognized by federal courts as basis for sex discrimination), citing *Dorn-Kerri v. Southwest Cancer Care*, 385 Fed. Appx. 643, 644 (9th Cir. 2010).

Bessler's filing of the September Charge is akin to the plaintiff's filing of administrative complaints in *Learned*. 860 F.2d at 931. In *Learned*, the employee filed a complaint with the Washington Human Rights Commission, alleging that his employer violated Title VII by subjecting him to disparate treatment due to his physical and mental limitations, as his supervisor had harassed him and called him "crazy" and "sick." *Id*. After the employee was then transferred and his responsibilities diminished, he filed complaints alleging retaliation. *Id*. The Ninth Circuit affirmed the district court's grant of summary judgment on the retaliation claim; because the employee had alleged discrimination based on physical and mental limitations – rather than membership in any protected class – he "could not reasonably have believed" the employer violated Title VII. *Id*. at 932. The Ninth Circuit clarified that an employee can simultaneously believe their claim has merit *and* have an objectively unreasonable belief that they are complaining about conduct that violated Title VII. *See id*. at 934. Under *Learned*, more than merely a "good faith belief" is required to show "protected activity."

When Bessler filed the September Charge, he lacked an "objectively reasonable belief" that the conduct he complained of actually violated the ADEA. Bessler's age discrimination claim was founded on his allegation that Ching's motivation for disparate treatment was experience. [*See* **Ex. 16**] Distilled to its essence, his position was that treatment based on experience is necessarily based on age – even though experience is a function of prior engagements and practical contact with subject matter, and age is purely a function of time. He clearly conflated experience with age in his Charge, yet

later acknowledged these are distinct "*concepts*" that are "*not inseparable.*"[3] [**Ex. 1** (*Bessler*) at 74:2-25] Bessler's theory is also irreconcilable with the fact that he was not even the oldest Director – Broderick was. Bessler knew this when he filed the September Charge, and conspicuously alleged: "*...I am the most aged <u>male</u> employee that reports through to Ching.*" [**Ex. 16** at EEOC-0048 (emphasis added)]. If Ching actually bore a discriminatory animus against older employees, there is no reasonable explanation for why he allegedly targeted only Bessler, but not Broderick. [**Ex. 30** at ¶ 8]

Experience, unlike age, is not a protected class. Disparate treatment that is based on experience is lawful, and it is <u>not</u> age discrimination. *See Rhinehart v. IBM*, 124 F. 3d 212, at *1 (9th Cir. Aug. 13, 1997) (affirming summary judgment dismissal of age discrimination claim and rejecting argument that applying "higher evaluation criteria to more experienced employees [was] discriminatory"). A complaint about disparate treatment motivated by an employee's experience is not objectively reasonable, as a matter of law. *See Learned*, 860 F.2d at 932 ("Learned did not allege that he ever opposed any discrimination based upon his race, color religion, sex, or national origin."); *Quednau v. Arizona*, 2013 WL 5314358, at *4 (D. Ariz. Sept. 20, 2013) (under *Learned*, employee's complaint of "sexual slurs" was not based on objectively reasonable belief of gender discrimination). Here, at best, Bessler unreasonably inferred that disparate treatment motivated by his experience was unlawful under the ADEA. Assuming, *arguendo*, that Bessler had a good faith belief that this claim had merit, this was <u>not</u> an objectively reasonable belief. It was no basis for protected activity.

        **2.  Even if Bessler *had* engaged in "protected activity," this still could not have been the but-for cause of his separation.**

Bessler's retaliation claim would fail even if he had engaged in "protected activity," as he cannot prove but-for causation. He cannot show *any* causal nexus

---

[3] Bessler even wrote in his affidavits that he "*had the most experience and strongest resume*" of any candidate for the Cottonwood City Manager position, and that a headhunter praised his "*extensive related experience.*" [**Ex. 24** at DB-0057; **Ex. 25** at DB-0059; **Ex. 1** at 120:11–123:15] This was clearly intended to suggest that he was a strong candidate, which shows he understands that disparate treatment based on experience does *not* violate the ADEA.

1    between his September Charge and Tempe's prior agreement with him that his

2    employment should end, much less that his charge was the *but-for* cause of his

3    separation. This is obvious, because Bessler told his supervisor that he wished to leave

4    his job and the decision to separate his employment was made <u>before</u> he engaged in any

5    protected activity – and well before Ching, Methvin, or Jones became aware of it.

6    "To demonstrate a sufficient causal link, a…ADEA plaintiff 'must establish that

7    his or her protected activity was a but-for cause of the alleged adverse action by the

8    employer.'" *Coleman v. Home Health Res. Inc.*, 269 F. Supp. 3d 935, 945 (D. Ariz.

9    2017), citing *Nassar*, *supra*. "The plaintiff thus bears the burden to show that her

10   protected action was more than a mere 'motivating factor' in the retaliation." *Id*.

11   (citations omitted). "[P]rotected activities that occur subsequent to alleged retaliatory

12   acts cannot support a causal link between the protected activity and the adverse

13   employment action, *i.e*., that plaintiff engaged in a protected activity and as a result the

14   employer took adverse action." *Quinones v. Potter*, 661 F. Supp. 2d 1105, 1128 (D.

15   Ariz. 2009), citing *Timmons v. United Parcel Service, Inc*., 310 Fed. Appx. 973, 975

16   (9th Cir. 2009) (employer "could not have retaliated against [employee] because the

17   alleged adverse actions against [employee] took place before [employee] engaged in any

18   protected activities"). <u>Here, Tempe agreed with Bessler that his employment should end,</u>

19   <u>and affirmatively decided to separate it weeks before he allegedly first engaged in</u>

20   <u>protected activity</u>. This inescapable fact precludes the possibility of "but-for" causation.

21   Even under a standard not as demanding as the "but-for" causation standard,

22   proving causation would still – at the absolute least – require proof that the termination

23   decision was made *after* the employee engaged in "protected activity." Here, Bessler has

24   no such evidence, because it does not exist. Tempe, meanwhile, has produced ample

25   evidence that shows the decision and agreement that his employment would end was

26   made *before* September 24, 2018. Nothing changed. <u>Ching, Methvin, and Jones have</u>

27   <u>corroborated each other's sworn testimony, and their sworn testimony is further</u>

28

corroborated by the text messages exchanged between Ching and Methvin that show they were actively trying to advance Bessler's separation. Bessler even concedes that he does not know if between September 6 and September 24, decision-makers (*e.g.*, Ching) expected that he would resign. [**Ex. 1** at 89:1-16; 90:19-25] Moreover, it is undisputed that before Bessler even claimed to have filed a charge, he had: (1) organized the September 24 meeting to propose terms for his separation; (2) told management that he wanted to leave his employment; and (3) begun negotiation of a potential severance package. These facts show Bessler's separation was a forgone conclusion by the time he claims to have first engaged in "protected activity."

Bessler alleges that "*no adverse employment action had been taken against*" him until he claimed he had filed a charge. [Compl. at ¶ 61] Bessler's sworn documents completely contradict this claim. The September Charge only alleged events prior to the September 24, 2018 meeting, and asserts "…*I have been retaliated against*…" [**Ex. 16** at EEOC-0048] Similarly, one of Bessler's affidavits alleges that in the week of September 10, Ching engaged in "*retaliation and constructive discharge tactics*…" against him. [**Ex. 19** at DB-0022] Referencing his September 26 discussion with Methvin and Bauman, another affidavit asserts "*a continuation of Ching's…retaliatory behavior*." [**Ex. 19** at DB-0026 (emphasis added)] Bessler cannot have it both ways by claiming he *was* subjected to retaliation – and thus, adverse employment action – before September 24, and simultaneously, claiming that this only happened after September 24. Bessler's dubious theory of causation also ignores that he told management he wanted to leave his job with Tempe, and that the decision to end his employment was made before September 24. Additionally, this theory completely glosses over the fact that Ching was already so dissatisfied with Bessler's performance when he expressed his desire to resign, that Bessler would have ultimately ended up unemployed regardless of whether he engaged in "protected activity." [**Ex. 28** at ¶ 7] Engaging in protected activity (if it even happened here) did not make Bessler's employment impervious to separation. *See*

*Evers v. Safety-Kleen Sys., Inc.*, 2012 WL 910392, at *10 (D. Ariz. Mar. 19, 2012) (an employee "ought not to be able, by engaging in [protected] conduct, to prevent his employer" from reaching decisions on the basis of his employment record).

### 3. Tempe accepted Bessler's offer of resignation before it could have independently subjected him to adverse employment action.

Tempe's decision to separate Bessler's employment was made in response to him telling Methvin on June 6, 2018 that he did not want to continue his employment and wanted a severance package. The decision was an acceptance of Bessler's offer of resignation, and he reaffirmed this position during the June 24 severance negotiation meeting: he (and Mary Bessler) unequivocally admitted that he expressed his desire and intent to resign during that meeting, <u>before</u> ever mentioning any charge or alleged protected activity. Tempe's June 6 and June 10 decision was its acceptance of Bessler's offer of resignation, and the fact that a separation date was not yet agreed upon did not change this. *See Yardley v. ADP TotalSource, Inc.*, 2014 WL 1494105 (C.D. Cal. Mar. 12, 2014) (affirming ruling on summary judgment for employer; employee who expressed intent to resign in nine weeks was not terminated when employer responded by forcing separation in two weeks). Likewise, Bessler's subsequent attempt to dictate the conditions under which he would resign (which Tempe would not accept) also did not change his resignation. *See id.* (noting that allowing employees to offer "conditional resignation" would "distort common sense," as "[a]n employee cannot dictate the conditions on which she is going to resign").

### B. Even if Bessler could establish a *prima facie* case of retaliation, Tempe had legitimate, non-retaliatory reasons for separation.

Even if Bessler could establish a *prima facie* case of retaliation, this would not change the outcome, as Tempe had a legitimate, non-retaliatory reasons for separation. If the employer provides a legitimate business reason for discharge, the burden shifts to the employee to prove pretext. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001). "The focus of a pretext inquiry is whether the employer's stated reason

was honest, not whether it was accurate, wise, or well-considered." *Fleming v. IASIS Healthcare Corp*., 151 F. Supp. 3d 1043, 1053 (D. Ariz. 2015).

As stated, Bessler's conversation with Methvin on September 6, 2018 ultimately caused Ching and other members of Tempe's leadership to reasonably believe that Bessler wanted to leave his job with Tempe and resign. This, in turn ultimately resulted their decision to separate his employment. Tempe's decision on Bessler's separation was based on both (1) his expressed a desire to leave his job and (2) the issues that arose in Public Works under his leadership and management. Bessler – who concedes that he does not know whether others *genuinely* believed that he resigned – cannot reasonably dispute this. He concedes he told Methvin he wanted to leave his job <u>before</u> engaging in any protected activity, and Ching's negative opinions of Bessler's leadership and management were public (and documented by Bessler). It is Bessler's burden to prove pretext and show that Tempe's proffered reasons for his termination are not honest, and he clearly cannot do this.

**C.**    **<u>Bessler failed to mitigate damages incurred after November 2018</u>.**

As explained in Tempe's Response to Bessler's MPSJ, Bessler failed to sustain a diligent pursuit of "substantially equivalent" employment: he pursued no job opportunity after November 30, 2018 because he settled for temporary work within a month of his termination from Tempe. As such, he willfully failed to mitigate all damages allegedly incurred on or after November 31, 2018.

**IV.**    **<u>CONCLUSION</u>**

Based on the forgoing, Defendant requests summary judgment on: (1) liability for Bessler's retaliation claim and (2) damages, for any incurred on or after November 31, 2018. Defendant also requests an award of attorneys' fees and costs.

RESPECTFULLY SUBMITTED this 26th day of February 2021.

JACKSON LEWIS P.C.

By: */s/ J. Greg Coulter*
        J. Greg Coulter
        J. Alexander Dattilo
        Attorneys for Defendant

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 26, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Tod F. Schleier
Bradley H. Schleier
SCHLEIER LAW OFFICES, P.C.
3101 N. Central Avenue, Suite 1090
Phoenix, Arizona 85012
tod@schleierlaw.com
brad@schleierlaw.com

*Attorneys for Plaintiff*

By: */s Amalia Tafoya*

4835-5710-2550, v. 1